(C. D. 1645)

THORNLEY & PITT a/c EARL INVESTMENT CORPN. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 14, 1954)

*Lawrence & Tuttle* (*George R. Tuttle* and *Charles F. Lawrence* of counsel) for the plaintiff.

*Warren E. Burger*, Assistant Attorney General (*Samuel D. Spector* and *Richard H. Welsh*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; LAWRENCE, J., not participating

Rao, Judge: The merchandise which forms the subject of the instant controversy consists of two Caterpillar Model 12 Road Graders, serial numbers 2S6392 and 2S6464, which were imported from the Philippine Islands, together with certain other road graders and tractors, not here in issue. Entry of the disputed machines was made on a proportionate basis, 80 per centum of the value thereof being claimed free as American goods returned within the provisions of paragraph 1615 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938. The remaining 20 per centum, representing machinery parts allegedly added to said graders in Australia, was entered as parts of machines, dutiable at the rate of 15 per centum ad valorem, as provided for in paragraph 372 of the said tariff act, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

Predicated upon information received from the appraiser's office to the effect that "the unfinished graders which were exported from the United States were subject to an actual process of manufacture abroad," the collector rejected the claim for free entry of a portion of the graders as American goods returned. Accordingly, he assessed duty upon each article in its entirety at the rate of 15 per centum ad valorem, pursuant to the provision in said paragraph 372, as modified, for all other machines, not specially provided for.

By way of amendment to the protest, it is asserted, alternatively, that each of the two road graders is free of duty as American merchandise returned, pursuant to said paragraph 1615, as amended; that the portion of the graders which was of American origin is free of duty by virtue of said paragraph 1615; or that both machines are entitled to free entry within the provisions of Public Law 869, 64 Stat. 1093, ch. 1119, as scrap.

The various tariff provisions, hereinabove cited, read as follows:

Paragraph 372, Tariff Act of 1930, as modified, *supra*:

Machines, finished or unfinished, not specially provided for:

   \*       \*       \*       \*       \*       \*       \*

Other \* \* \*_____ 15% ad val.

Paragraph 1615 of the Tariff Act of 1930, as amended by section 35, Customs Administrative Act of 1938:

Sec. 35. Section 314 of the Tariff Act of 1930 (U. S. C., 1934 edition, title 19, sec. 1314) is hereby repealed and paragraph 1615 of the Tariff Act of 1930 U. S. C., 1934 edition, title 19, sec. 1201, par. 1615) is hereby amended to read as follows:

    Par. 1615. (a) Articles, the growth, produce, or manufacture of the United States, when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means.

   \*       \*       \*       \*       \*       \*       \*

    (h) The allowance of total or partial exemption from duty under any provision of this paragraph shall be subject to such regulations as to proof of

identity and compliance with the conditions of this paragraph as the Secretary of the Treasury may prescribe.

Public Law 869 (footnote to T. D. 52656, 86 Treas. Dec. 27):

Sec. 1. (a) No duties or import taxes shall be levied, collected, or payable under the Tariff Act of 1930, as amended, or under section 3425 of the Internal Revenue Code with respect to metal scrap, or relaying and rerolling rails.

(b) The word 'scrap', as used in this Act, shall mean all ferrous and non-ferrous materials and articles, of which ferrous or nonferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured.

Sec. 2. Articles of which metal is the component material of chief value, other than ores or concentrates or crude metal, imported to be used in remanufacture by melting, shall be accorded entry free of duty and import tax, upon submission of proof, under such regulations and within such time as the Secretary of the Treasury may prescribe, that they have been used in remanufacture by melting: *Provided, however*, That nothing contained in the provisions of this section shall be construed to limit or restrict the exemption granted by section 1 of this Act.

Sec. 2. The amendment made by this Act shall be effective as to merchandise entered, or withdrawn from warehouse, for consumption on or after the day following the date of the enactment of this Act and before the close of June 30, 1951. It shall also be effective as to merchandise entered, or withdrawn from warehouse, for consumption before the period specified where the liquidation of the entry or withdrawal covering the merchandise, or the exaction or decision relating to the rate of duty applicable to the merchandise, has not become final by reason of section 514, Tariff Act of 1930.

NOTE: Section 2 of Public Law 869, 81st Congress, applies to both sections 1 (a) and 2 of the Act of March 13, 1942, as amended by said Public Law 869.

In view of its relevancy to the issues herein, we quote as well the following from the Customs Regulations of 1943:

**10.1 Requirements on entry.**—(a) The following documents shall be filed in connection with the entry of articles claimed to be free of duty under paragraph 1615, Tariff Act of 1930, as amended:

(1) A declaration of the foreign shipper on consular Form 129 (Invoice of Returned American Goods and Declaration of Foreign Exporter) certified by the American consular officer, if the value exceeds $100, together with a commercial or pro forma invoice setting forth the information required by or pursuant to section 481, Tariff Act of 1930. An invoice on consular Form 138 shall not be required if consular Form 129 is filed within the period provided for in these regulations.

(2) An affidavit of the owner, importer, consignee, or agent on customs Form 3311.

(3) A certificate, customs Form 4467, of the collector of customs at the port from which the merchandise was exported from the United States. Such certificate shall show whether drawback was claimed or paid on the merchandise covered by the certificate and, if any was paid, the amount thereof. This certificate shall be issued on application of the importer, or of the collector at the the importer's request, and shall be mailed by the issuing officer directly to the port at which it is to be used. If the merchandise has been exported from the port at which entry is made and the fact of exportation appears on the records

of the customhouse, the fact of reimportation shall be noted on such export record but the filing of the certificate on Form 4467 shall not be required.

\* \* \* \* \* \* \*

At the trial, seven witnesses were called to testify on behalf of the plaintiff. The first of these was Norman Carlton Unfug, a customs broker who, for 10 years, has been a member of the firm of Thornley & Pitt. Unfug signed the entry of the instant merchandise, 80 per centum of which was entered under paragraph 1615, *supra*, as American goods returned, 20 per centum under paragraph 372, *supra*, at 15 per centum ad valorem, as parts of machines. His office prepared the *pro forma* invoice, on which appears the following statement:

(AMER MDSE RET'D)

2 (CATERPILLAR MODEL 12 ROAD GRADERS
   SERIAL NOS. 2S6392, 2S6464
     VALUE $14,210.52 80% AMER. MDSE RET'D)_____ 11, 368. 42
     20% OF VALUE OF $14,210.52
     REPRESENTS MACHINERY PARTS
     ADDED TO GRADERS IN AUSTRALIA_____ 2, 842. 10

The only knowledge the witness had to support the statement that 20 per centum of the value was added in Australia was a letter from the Caterpillar Tractor Co., which was received in evidence as plaintiff's exhibit 1. He could not state whether foreign parts were, in fact, installed, nor was he able to identify any such parts.

The letter of Caterpillar Tractor Co., bearing date of December 10, 1948, indicates that the involved motor graders were sold to the Corps of Engineers, United States War Department, in 1944, for completion in Australia. The price for each special arrangement was $4,886.25 f. o. b. factory, Peoria, Ill., or 78.8 per centum of the list price of $6,200 for a complete motor grader.

It further appears from Unfug's testimony that in connection with the entry he filed an affidavit for free entry of returned American products on customs Form 3311, as required by the Customs Regulations of 1943, *supra*, but did not furnish either Form 4467 (certificate of export) or Form 129 (declaration of foreign shipper), which said regulations also require. Instead, he gave bonds for the production of those documents, and, later, upon application and the payment of a fee, the bonds were canceled.

Unfug also testified that, during the war, Thornley & Pitt engaged in the clearing of vessels bound from the port of San Francisco to foreign ports, among which were many vessels carrying military cargo. As to such vessels, no export declarations were filed with the collector. They were cleared on an outward foreign manifest and a description of the merchandise as United States military cargo. No detailed description, marks, numbers, or weights were supplied. When ordinary cargo, which included, in part, merchandise upon which

drawback had been obtained, was exported, such fact was recorded in the customhouse. This was not so in the case of cargo shipped from the United States by the military forces during the war.

Leo J. O'Reilly, deputy collector of customs in charge of the liquidating division in the collector's office in the port of San Francisco, and, in the absence of the assistant collector, acting assistant collector of customs, testified that, during the war, military vessels were exempt from the filing of shipper's export declarations, as was military cargo; and that the liquidation of the instant importation was made by a liquidator, named Alan Silver, under the supervision of the witness but under the immediate supervision of one Al Weiner.

Liquidator Al Weiner testified, after examining the file, that liquidation was based on information furnished the collector's office by the appraiser's office on customs Form 4371.

Appraiser Thaddeus L. Walton testified that the red-ink signature on customs Form 4371, which was received in evidence as plaintiff's exhibit 2, was that of Examiner E. C. Knowlton, who was presently in Houston, Tex.; and that statements on said form were made in the regular course of business, under his supervision. This witness had no recollection of whether plaintiff's exhibit 1, the letter from Caterpillar Tractor Co., was before him at the time of appraisement, despite the fact that the entry number is stamped thereon. Neither did he have any independent information that the involved graders consisted in part of foreign-made material. He accepted the information that was given on the invoice by the examining officer to that effect, and whatever other information was in the file. At this juncture, the entire file was offered and received in evidence without objection. Appraiser Walton then reiterated that he did not know whether either American or Australian parts were added to the instant road graders in Australia or in any other country. He predicated his appraisement entirely upon information obtained by the examiner and not upon any independent knowledge of his own. Moreover, he did not know whether or not the examiner's knowledge or information was limited to the file.

There was also received in evidence, as plaintiff's exhibit 3, a copy of a letter from W. E. Higman, chief, Division of Classification, Entry, and Value of the Bureau of Customs, addressed to the collector of customs at San Francisco, indicating that without information concerning the date of exportation of the instant merchandise the Bureau was unable to advise whether section 30.46 of the regulations for the collection of statistics of foreign commerce and navigation of the United States, dispensing with the necessity of filing export declarations in the case of "shipment of military and naval supplies and equipment for the use of United States military and naval forces abroad," was applicable to the involved exportations.

Ross Berglund, president of the Berglund Tractor and Equipment Co., was also called to testify on behalf of plaintiff. He stated that his company, which has been in business in Napa, Calif., since 1927, purchases and sells heavy equipment for roads, farming, mining, and logging, including tractors, motor graders, rollers, plows, and disks. The Berglund Tractor Co., together with plaintiff, Earl Investment Corp., brought in from the Philippines quite a number of pieces of equipment. Part of the importation, including the involved graders, was taken by Berglund; the remainder by Earl Investment Corp. As to the instant graders, witness Berglund first saw them when they arrived in Napa by barge from San Francisco, a distance of about 50 miles. At that time, he stated "They looked pretty rough. Most of the tires were off and they were not in a runable condition. Magnetos were taken from some." Under the jurisdiction of the shop foreman, and one Myles Butler, manager of the Napa store, the road graders were "stripped down completely; everything taken apart, sand blasted and remanufactured for sale." It appears, however, that witness Berglund was unable to distinguish the condition of the involved graders from the others he had purchased. He could not describe the work performed on the two graders, bearing numbers 2S6392 and 2S6464, nor was he able to tell which parts were of foreign origin, although he knew there were some.

Witness Myles M. Butler testified that he has been employed by Berglund Tractor Co. since 1936. He is presently store manager, but, in 1948, he was purchasing agent, doing purchasing, general office work, and sales. He stated that he first saw the involved road graders at dockside after they were taken off the ship. The graders were then trucked from there to the property of the Berglund Tractor Co. There, they were stripped down, sandblasted to remove the rust, and remanufactured for sale. The machines were completely rebuilt, and all parts which would not pass a rigid inspection were removed. As against an original cost of $6,500 for each grader, as imported, approximately $4,000 per unit was spent for repairs, parts, and labor.

In the words of this witness, they "metally remanufactured" each machine, replacing what was needed with new parts, after cleaning the frame. In addition to the frame, the engine block, and the controls, in part, were usable. Butler stated that a grader consists of a frame, motive power, necessary controls, various attachments, and a 10- or 12-foot blade. It has a Caterpillar Diesel engine, with an auxiliary gas-starting motor, which was missing. He was of opinion that, in their imported condition, these two machines were scrap, not fit for any use other than to be repaired or remanufactured. Some of the parts which he found to be missing were tires and wheels, intake and exhaust manifolds, scarifier, generator, batteries, and start-

ing motor. He also noted that the motive power was completely frozen and that there were shrapnel or shell holes in it. The engines were completely ruined. There was an extreme amount of damage due to rust and depreciation.

In the stripping down and rebuilding of the machines, there was no way to tell which parts were of foreign origin. All parts looked the same except for the frame on which was superimposed an emblem of two letters. The total cost of a new road grader at the time of importation was approximately $12,000, so that when these two machines were purchased at a cost of $6,500 per unit they were expected to be secondhand. It was necessary to rebuild them before they were sold. After each machine was restored to usefulness, it was sold for approximately $12,000.

Leo J. Koford was also called to testify concerning the reconditioning of the road graders in issue. At the time of importation, he was a mechanic for the Berglund Tractor Co., charged with the duty of repairing, overhauling, and rebuilding tractors. He first saw the involved machines when he helped unload them from the barge at Napa. At that time, they were in very poor condition, "rusty and froze together and the first thing the tires were all missing and several parts missing." One grader was given to him as his responsibility to restore to first-class condition. He also helped to rebuild the other. The machines were completely dismantled; the bolts were burned off with acetylene gas; then, the frames, transmission, block, gear boxes, and tandems were sandblasted and steam-treated.

This witness described a road grader as a machine which grades roads, with a blade to level the road which is being graded. It is propelled by a Diesel engine; it also has a gas engine, and a set frame for the use of the operator. In addition, there are gears and controls. After the machines were torn down, all the missing parts were replaced; "such things as the gears in the transmission were replaced because they were so pitted from rust and from moisture being in there and all of the wearable parts being replaced." Also replaced were liners, pistons, bearings, gaskets, seals, bolts, brake linings, tires, tubes, some controls, and a radiator. Replacement parts were obtained from the Caterpillar Tractor Co. of San Leandro, Calif.

Koford stated that there was nothing about the machines or their parts when he first saw them to indicate that they were not made in the United States. "As far as I saw them, they all looked like any number 12 graders with the exception of the frame. They had the initials on the nose of the frame." Except for the initials on the frame, the involved graders were identical with the other three graders imported at the same time, and which were admitted free as American goods returned.

So far as this witness was concerned, the graders in issue were secondhand machines. Ordinarily, in repairing a secondhand machine, he has to replace defective or wearable parts. It is not usual to sandblast them; steam-cleaning is sufficient. These machines, however, were in such bad shape that they were beyond the overhauling stage. They had to be rebuilt. The block, frame, and wheels were reconditioned, and reused. The rusty and frozen parts were removed and new parts installed. Rebuilding starts from the ground up. Overhauling consists of grinding or replacing the valves, replacing liners, etc.

Considering first importer's alternative claims for free entry of the subject motor graders, either in whole or in part, as American goods returned, by virtue of the provisions of paragraph 1615 of the Tariff Act of 1930, *supra*, it seems clear from the record before us— a record made up entirely of evidence introduced by the plaintiff— that the requirements of the statute and the regulations promulgated in pursuance thereof have not been met.

By the terms of the paragraph, free entry of articles of American manufacture is authorized when the same have been returned to the United States after exportation, without advancement in value or improvement in condition. To what extent, if at all, the machines before us have been returned to the United States, without advancement in value or improvement in condition, we have no way of knowing. Customs Form 3311, the affidavit for free entry of returned American products, signed by the witness Unfug, asserts that all of the items listed on the *pro forma* invoice were returned in the same condition they were in at the time of exportation. Nevertheless, he entered 20 per centum of the value of the motor graders here in controversy as a dutiable item representing the value of "machinery parts added to graders in Australia." He also admitted that his knowledge of the fact of additions in Australia was derived solely from the letter of the American manufacturer, Caterpillar Tractor Co., plaintiff's exhibit 1. That letter, an exhibit produced by plaintiff, and, hence, evidence by which it is bound, states that the special motor grader arrangements, bearing the serial numbers of the machines here involved, were "not completely manufactured" at the time they were sold to the United States Army Engineers Corps, and that they were destined "for completion in Australia." It must, therefore, be assumed that something was done to them when they arrived in Australia. But there is not a scintilla of evidence to show what that something was. As to whether there were additional manufacturing processes, whether additional parts were added, and, if so, what was the origin of such parts, the record is silent.

The examiner's memorandum to accompany invoice, likewise introduced in evidence by plaintiff (exhibit 2), indicates that there was

information available to the appraiser's office to the effect that "the unfinished graders which were exported from the United States were subject to an actual process of manufacture abroad and consequently, were not, at time of importation within the purview of Par 1615 (a), T. A. 1930." The record does not refute this statement.

If, as must be assumed from the facts here established, some finishing process was applied to the special motor arrangements in Australia, or in some other foreign jurisdiction, it being noted that the return shipment to the United States originated from the Philippines, it was incumbent upon the plaintiff both to identify that portion of the merchandise which was of initial American manufacture, and to establish that the treatment thereof abroad did not operate to advance the value or improve the condition of the American product. *C. B. Richard & Co.* v. *United States*, 19 Treas. Dec. 24, T. D. 30268; *United States* v. *Reid & Co.*, 10 Ct. Cust. Appls. 85, T. D. 38357; *United States* v. *Bird*, 11 Ct. Cust. Appls. 229, T. D. 38991. Evidence of this character is entirely lacking.

Plaintiff cites, as authority for the free entry of 80 per centum of the involved graders as of American origin, the case of *Denike* v. *United States*, 5 Ct. Cust. Appls. 364, T. D. 34553, wherein wheels and axles of American manufacture, fitted with tires of German manufacture, were shipped to Mexico for the turning of the tires. The turning process removed the sharpness of the flange and certain flat spots on the tread. That case is at once distinguishable from the instant one by virtue of affirmative proof that no work was performed in Mexico on either the wheels or the axles, the American-manufactured articles claimed to be free of duty under paragraph 500 of the Tariff Act of 1909 as American goods returned. Moreover, the wheels and axles were clearly identifiable and readily segregable from the tires. The court was, therefore, easily able to conclude that the wheels and axles were American goods returned, without having been advanced in value or improved in condition. We have no evidence from which a similar conclusion might be reached in the instant case.

This phase of the case alone suffices to deny the claim for free entry, in whole or in part, of the subject merchandise, as American goods returned within the provisions of paragraph 1615, *supra*. But were it not, there is a conceded omission to comply with the applicable customs regulations governing identification and exportation of the American-made products sought to be returned to the United States with the privilege of free entry. The validity of said regulations and the authority of the Secretary of the Treasury to promulgate them under the specific enabling language of the involved paragraph have not been challenged. Hence, they have the force and effect of law, and compliance therewith is a condition precedent to the importer's right to invoke the provisions of the statute to which they apply. See

*Maple Leaf Petroleum, Ltd.* v. *United States,* 25 C. C. P. A. (Customs) 5, T. D. 48976, and cases cited therein.

Plaintiff contends, however, that compliance with that portion of the regulations, *supra,* requiring the filing of a certificate of exportation (customs Form 4467), was rendered impossible as no customs records were kept of the exportation of military goods, citing § 30.46 of the regulations for the collection of statistics of foreign commerce and navigation of the United States, Bureau of the Census, 15 C. F. R., § 30.46, which provides as follows:

> *Shipments of furniture, supplies, equipment owned by Government offices and employees.*—No export declarations are required for shipments of office furniture, equipment and supplies, household goods and personal property to United States offices or employees in foreign countries or noncontiguous territories for their exclusive use, or for shipments of books, maps, charts, and pamphlets made by United States Government offices to foreign libraries or Government establishments or for shipment of military and naval supplies and equipment for the use of United States military and naval forces abroad.

As pointed out in plaintiff's exhibit 3, a letter from the Bureau of Customs, without evidence as to the date or dates of exportation, it is impossible to determine whether the provisions of the cited regulation operated to effect the instant transaction. Neither may it be inferred from the proof here adduced, to the effect that military cargo and military vessels were cleared without detailed description or the filing of an exportation declaration, that the involved motor graders were military or naval supplies or equipment for the use of the United States military or naval forces abroad.

Moreover, even if the provisions of this regulation rendered unnecessary the filing of customs Form 4467, the omission to file the declaration on consular Form 129 (invoice of returned American goods and declaration of foreign exporter), also required by section 10.1 of the Customs Regulations of 1943, *supra,* would be fatal to this aspect of plaintiff's case.

For all of the foregoing reasons, we find the claim for free entry of the instant merchandise as American goods returned to be untenable.

The next question to be determined is whether the involved road graders are free of duty as scrap, within the provisions of Public Law 869, *supra.* Scrap is defined in said statute as "articles, of which ferrous or nonferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured."

In invoking the provisions of this statute, plaintiff urges that a " 'damaged' road grader 'fit only to be remanufactured' falls squarely within this law." Counsel for the Government counters with the argument that "before imported merchandise can be said to be scrap within the purview of Public Law 869, *supra,* at the time of impor-

tation it must be in such a condition that it is fit only to be remanufactured by *remelting*" [italics quoted], citing *Harry Harris & Co.* v. *United States*, 29 Cust. Ct. 331, C. D. 1488.

The statute does not impose the limitation sought to be placed upon it by counsel for the defendant. A thorough reading of the entire law plainly indicates that fitness for remanufacture by melting alone has not been made the test of metal scrap. If the secondhand, obsolete, defective, or damaged article is, in fact, fit only to be remanufactured, it is immaterial by what process or series of processes the remanufacture is brought about.

Since the articles in the case at bar have been shown by uncontroverted evidence to have been secondhand, defective, or damaged, and there seems to be no dispute as to their being composed of metal, the question arises whether in their condition, as imported, they were "fit only to be remanufactured." The mere statement of the witnesses that these articles were scrap, fit only to be remanufactured, is a conclusion which does not suffice to resolve this question. It becomes necessary to consider what processes were undertaken to restore the motor graders to a usefulness they did not possess at the time of importation. Actual use has a very important and pertinent bearing upon fitness for use, provided such actual use is not a strained, thwarted, unusual, or fugitive application.

The testimony of the witnesses who performed or supervised the reconstruction job reveals that these machines were taken apart as far as it was possible to do so. "We took everything else except the parts that were welded to the frame. We purchased a sandblasting machine. We completely sandblasted the main member." The frame, engine block, controls in part, and the blade were usable, and were, in fact, reused, after being sandblasted. New parts supplied were generators, batteries, manifolds, starting motors, radiators, tires, wheels, gears in transmission, liners, pistons, bearings, gaskets, seals, and bolts.

The machine upon which all the work was performed was a damaged motor grader. The machine resulting from these efforts was a reconditioned motor grader. We are constrained to conclude that these machines were repaired but not remanufactured. Too much of the original structure was retained in the reconstituted one to warrant the conclusion that the latter is a remanufacture of the former.

Public Law 869, *supra*, is an amendment of, and finds its origin in, the act of March 13, 1942 (ch. 180, 56 Stat. 171), which, in substance, was a law granting free entry to scrap iron and scrap steel, as defined in paragraph 301 of the Tariff Act of 1930. The phrase "fit only to be remanufactured," found in Public Law 869, is a part of the terminology employed by Congress in said paragraph 301 to define scrap iron and scrap steel. The definition *in toto* reads as follows:

\* \* \* That nothing shall be deemed scrap iron or scrap steel except secondhand or waste or refuse iron or steel fit only to be remanufactured.

While the present enactment constitutes an enlargement upon the said tariff provision, the phrase "fit only to be remanufactured" is susceptible of no different construction under the later enactment than it possessed under the former.

In the case of *Boston Iron & Metal Co.* v. *United States*, 63 Treas. Dec. 1397, Abstract 23526, old anchors, classified as anchors, pursuant to paragraph 319 (a) of the Tariff Act of 1930, were claimed to be scrap iron or scrap steel within the provisions of paragraph 301 of said act. It appears that the merchandise, in its condition as imported, was not suitable for use as anchors, because the pins, shackles, "stocks," or cross bars were badly worn. After the anchors were repaired, they were sold and used as anchors, their value having increased from $15 to $60 per ton. It was held "as a matter of law that the anchors constituting the imported merchandise in suit being capable of being repaired and still used as anchors are not 'scrap iron or scrap steel' within the meaning of paragraph 301 of the Tariff Act of 1930 \* \* \*."

Similarly, the motor graders in suit being capable of being repaired and used as motor graders are not metal scrap within the meaning of Public Law 869. Accordingly, the merchandise at bar is not entitled to free entry within the provisions of said Public Law 869 as metal scrap. All claims in the protest and/or in amendments thereto are, therefore, overruled.

Judgment will be entered accordingly.