(C. D. 1899)

COLLINS & GISSEL
PETROLEOS MEXICANOS } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided July 16, 1957)

*Sharretts, Paley & Carter* (*Howard C. Carter, Richard F. Weeks*, and *Jerome Fisch* of counsel) for the plaintiffs.

*George Cochran Doub*, Assistant Attorney General (*Mollie Strum* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

FORD, Judge: The merchandise the classification of which is challenged by this suit was classified by the collector of customs at Galveston, Tex., as "Articles or wares, N. S. P. F., whether partly or wholly manufactured, composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc aluminum or other metal, other," with the consequent levy of duty thereon at the rate of 22½ per centum ad valorem under paragraph 397 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802. The material portion of plaintiffs' protest is couched in the following language:

We claim that vessels and parts thereof are not imported articles within the meaning of the Tariff Act of 1930, are not subject to the tariff laws, and are not subject to duties thereunder. Without prejudice to the citation of further authority, we cite the CONQUERER, 166 U. S. 110 and C. A. D. 180.

By amendment, plaintiffs also claim that:

* * * this merchandise is free of duty under Public Law 869 (81st Congress) approved September 30, 1950, as extended by Public Law No. 66 (82nd Congress) approved June 30, 1951 as scrap articles of which nonferrous metal is the component material of chief value which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured.

There is no serious dispute between the parties regarding the factual situation in this case. Two witnesses testified for the plaintiffs at the trial of this case, and counsel for the defendant contented itself with cross-examination of these witnesses.

Everett Parsons, senior estimator, employed by the Todd Shipyards Corp., which is engaged in the drydocking, repairing, reconverting, and reconstruction of vessels, testified that he started in the shipyards corporation as an apprentice and, later, became a mechanic, supervisor, superintendent, price negotiator, and senior estimator; that, in this latter position, his duties are to make surveys of vessels in need of repair, to estimate the man-hours and material required, submit them to the corporation, in order that it may bid on or negotiate a price for whatever work is to be done; that, on or about January 12, 1952, he examined a ship's propeller, which had been placed on his company's drydock, and found that one blade of the propeller was missing for a distance of 4 feet; that the wheel's total diameter was approximately 10 feet; that three blades were badly bent and

scarred around all edges; and that one blade had a section missing about 4 to 6 inches deep for a distance of over 24 inches.

The witness further testified that this propeller was composed of bronze, a nonferrous material, and that it was secondhand at the time he received it; that it was badly damaged and not seaworthy; that, in the condition in which he received it, it would be condemned by the classification societies, the American Bureau of Shipping, the United States Coast Guard, or Lloyd's; that, based upon his experience, it was his opinion that, if such a propeller were used to propel a vessel, it would cause excessive vibration to the stern of the ship, which would transmit through the main shaft, go to the main engine, causing damage to the engine, bearings, and, possibly, the whole unit; that, in the condition in which he first found it, it was of no use.

The witness further testified that the propeller was shipped to the Doran-Alabama company for repairs, as these people "* * * thought that they could cast a new section from the blade that was broken and heating, bearing, and grinding true the balance of the blades"; that, after the propeller was repaired, it was returned to his company and installed on the SS. *Cerro Azul* about March or April of that year. Counsel then stipulated that the SS. *Cerro Azul* was a vessel of foreign registration and flies the Mexican flag. The witness also testified that the casting foundry price was in the neighborhood of $2,100, plus his company's labor in setting it up on proper blocks for transportation.

On cross-examination, this witness testified that the value of a good propeller of the type in this case would be in the neighborhood of $10,000; that he doubted it would cost as much as $20,000. He also explained that, when he testified the propeller was secondhand, he meant that he assumed it was secondhand; that it had been used. He testified further that, in the process of attaching the new part to the propeller, like all bronze materials, the metal is heated and fused together as you would weld steel; you can heat it and cast a new section to it; that, as he was not present when the job was done, he was not sure how far they went in the melting process; that he knew they had to melt one part of the blade sufficiently to cast the new section on to it; that the four blades on the propeller had been damaged and that one blade was broken off; that the other three blades that were damaged were heated and faired, which is a shipyard term for straightening something; that the edges were built up and ground smooth, both the leading and trailing edges of the blade, and that this repaired propeller was thereafter installed on the SS. *Cerro Azul*; that he had been told that it came from the SS. *Vera Cruz*; that the SS. *Cerro Azul* was a sister ship of the SS. *Vera Cruz*; and that this propeller could be used on either one of these ships, or could be used

on similar ships, provided the shaft diameter fits the bore of the propeller.

Plaintiffs' second witness, Raphael E. Higginbotham, testified that he was a gang-tree operator for the Harrisburg Machine Co.; that, in such capacity, on or about January 12, 1952, he removed a damaged propeller from the deck of the SS. *Vera Cruz* and put it on the Todd Shipyards drydock; that he looked at the propeller before he took it off the deck of the SS. *Vera Cruz*; that there was one blade that "was busted off, and the other was badly damaged"; that the propeller was in exactly the same condition when he landed it on the drydock of the Todd Houston yard; that he had not dropped it; and that nothing had happened to it before reaching the Todd Houston yard.

On cross-examination, the witness testified that a propeller is supposed to have four blades, and that the subject propeller had three blades when he picked it up, one was broken off and the others badly damaged; that this propeller would weigh roughly around 12,000 pounds; and that a little better than half the blade was broken off on the broken blade.

Based upon this record, counsel for the plaintiffs contend, in their brief filed herein, that the propeller in question is an integral part of the SS. *Vera Cruz*, and is, therefore, not "merchandise" within the meaning of the Tariff Act of 1930. Counsel for the plaintiffs cite, in support of this contention, the case of *The Conqueror*, 166 U. S. 110; *Canadian National Steamship Co.* v. *United States*, 29 C. C. P. A. (Customs) 123, C. A. D. 180; *United States* v. *Chain Cable*, 25 Fed. Cas. 391; *Thornley & Pitt* v. *United States*, 18 C. C. P. A. (Customs) 265, T. D. 44428; *Consolidated Water Power & Paper Company* v. *United States*, 23 Cust. Ct. 65, C. D. 1192; and *Thornley & Pitt* v. *United States*, 33 Cust. Ct. 136, C. D. 1645.

In the *Consolidated Water Power & Paper Company* case, *supra*, the merchandise was described as a "26 ft. Steelcraft gasoline winch boat, 20 HP engine, spare propeller and shaft" and was imported for use in transferring pulpwood logs in small lots from shallow water near the shore out to where a large boom was formed to be drawn by larger boats from the north shore to the south shore of Lake Superior. Counsel for the parties agreed "That the spare propeller and shaft in the case at bar were necessary spare parts for the boat involved in this case and were part of the equipment of said boat." The different state of facts in the two cases distinguish the one from the other, and we fail to see where the *Consolidated Water Power & Paper Company* case lends any support to the contention of the plaintiffs herein.

The *Thornley & Pitt* case, C. D. 1645, was concerned with two Caterpillar Model 12 Road Graders. The decision in that case does not lend any support to the contention of the plaintiffs herein that

the subject propeller is duty free under Public Law 869, as extended. In disposing of the question raised under Public Law 869 in the *Thornley & Pitt* case, this court said:

The next question to be determined is whether the involved road graders are free of duty as scrap, within the provisions of Public Law 869, *supra*. Scrap is defined in said statute as "articles, of which ferrous or nonferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured."

\* \* \* \* \* \* \*

Since the articles in the case at bar have been shown by uncontraverted evidence to have been secondhand, defective, or damaged, and [there seems to be no dispute as to their being composed of metal, the question arises whether in their condition, as imported, they were "fit only to be remanufactured." The mere statement of the witnesses that these articles were scrap, fit only to be remanufactured, is a conclusion which does not suffice to resolve this question. It becomes necessary to consider what processes were undertaken to restore the motor graders to a usefulness they did not possess at the time of importation. Actual use has a very important and pertinent bearing upon fitness for use, provided such actual use is not a strained, thwarted, unusual, or fugitive application.

The testimony of the witnesses who performed or supervised the reconstruction job reveals that these machines were taken apart as far as it was possible to do so. "We took everything else except the parts that were welded to the frame. We purchased a sandblasting machine. We completely sandblasted the main member." The frame, engine block, controls in part, and the blade were usable, and were, in fact, reused, after being sandblasted. New parts supplied were generators, batteries, manifolds, starting motors, radiators, tires, wheels, gears in transmission, liners, pistons, bearings, gaskets, seals, and bolts.

The machine upon which all the work was performed was a damaged motor grader. The machine resulting from these efforts was a reconditioned motor grader. We are constrained to conclude that these machines were repaired but not remanufactured. Too much of the original structure was retained in the reconstituted one to warrant the conclusion that the latter is a remanufacture of the former.

Public Law 869, *supra*, is an amendment of, and finds its origin in, the act of March 13, 1942 (ch. 180, 56 Stat. 171), which, in substance, was a law granting free entry to scrap iron and scrap steel, as defined in paragraph 301 of the Tariff Act of 1930. The phrase ·"fit only to be remanufactured," found in Public Law 869, is a part of the terminology employed by Congress in said paragraph 301 to define scrap iron and scrap steel. The definition *in toto* reads as follows:

\* \* \* That nothing shall be deemed scrap iron or scrap steel except secondhand or waste or refuse iron or steel fit only to be remanufactured.

While the present enactment constitutes an enlargement upon the said tariff provision, the phrase "fit only to be remanufactured" is susceptible of no different construction under the later enactment than it possessed under the former.

In the case of *Boston Iron & Metal Co.* v. *United States*, 63 Treas. Dec. 1397, Abstract 23526, old anchors, classified as anchors, pursuant to paragraph 319 (a) of the Tariff Act of 1930, were claimed to be scrap iron or scrap steel within the provisions of paragraph 301 of said act. It appears that the merchandise, in its condition as imported, was not suitable for use as anchors, because the pins,

shackles, "stocks," or cross bars were badly worn. After the anchors were repaired, they were sold and used as anchors, their value having increased from $15 to $60 per ton. It was held "as a matter of law that the anchors constituting the imported merchandise in suit being capable of being repaired and still used as anchors are not 'scrap iron or scrap steel' within the meaning of paragraph 301 of the Tariff Act of 1930 * * *."

Similarly, the motor graders in suit being capable of being repaired and used as motor graders are not metal scrap within the provisions of said Public Law 869. Accordingly, the merchandise at bar is not entitled to free entry within the provisions of said Public Law 869 as metal scrap. All claims in the protest and/or in amendments thereto are, therefore, overruled.

Similarly, it may be said here, that the propeller in suit, being capable of being repaired and used as a propeller, is not metal scrap within the provisions of said Public Law 869 as metal scrap.

The decision in the *Thornley & Pitt* case, 18 C. C. P. A. 265, as epitomized in the syllabus of that decision, clearly distinguishes that case from the present one, which syllabus we quote as follows:

Two pleasure sailing yachts imported on steamers, the boats being carried on deck, and the spars, sails, and other equipment in the hold, of each of the steamers, having a tonnage of 19 tons gross register and 55 feet in length, and 13.4 tons gross and 48 feet in length, respectively, are *vessels* within the meaning of section 3 of the Revised Statutes of the United States, it appearing that the separation of the rigging was necessary for their transportation.

*Held* that the boats, upon their condition on arrival, were *vessels* as fully as if they had been completely rigged upon the deck of the steamers before arrival.

The fact that the various parts had to be put together to make the whole does not affect the status of the merchandise as entireties. All the parts necessary to make each of the vessels complete were brought in the same steamer, and they were, upon their arrival, "suitable for" navigation and maritime service, requiring only the stepping of the masts and the bending of the sails which were separately carried in the holds of the steamers.

The decision of this court in *A. Johnson & Co., Inc.* v. *United States,* 17 Cust. Ct. 140, C. D. 1034, is also epitomized in the syllabus to that decision as follows:

Certain spare engine parts of one motorship which were transferred to and installed in a sister ship of the same line as replacement parts, were classified by the collector of customs as parts of machines, not specially provided for, dutiable at the rate of 27½ per centum ad valorem under paragraph 372, Tariff Act of 1930. The claim of the plaintiff that the articles are integral parts of a vessel and therefore not subject to the payment of duties under the doctrine of *The Conqueror* case, 166 U. S. 110, is untenable. *Moral & Co. S. en C.* v. *United States,* 16 Treas. Dec. 167, T. D. 29260; *United States* v. *Sickel,* 6 Ct. Cust. Appls. 146, T. D. 35394; *The Texas Transport & Terminal Co. (Inc.)* v. *United States,* 62 Treas. Dec. 223, T. D. 45897; *Page & Jones* v. *United States,* 26 C. C. P. A. (Customs) 124, C. A. D. 5; and *United States* v. *Chain Cable,* 25 Fed. Cases 391, Case No. 14776.

In the case of *The Conqueror, supra,* the doctrine was enunciated that ships or vessels which are liable to tonnage dues and to light money—except where a certain class of vessels is specially exempted—are not imported merchandise and therefore not subject to the imposition of customs duties under tariff laws. While

certain parts for the repair of a ship, made especially for the vessel when it was constructed, and which are carried thereupon for use as necessity requires, are parts of the vessel and hence not dutiable, it does not follow that the spare parts of one ship when transferred to another for use thereon can properly be regarded as parts of the latter vessel. In other words, repair merchandise that would be as suitable for one ship as for another, may not be regarded as a part of a particular vessel if it did not accompany the vessel. See *Canadian National Steamship Co., Ltd.* v. *United States*, 29 C. C. P. A. (Customs) 123, C. A. D 180, and *United States* v. *Chain Cable, supra*.

It will, therefore, be seen that the decision in the *Johnson* case, *supra*, lends no support to either of the contentions made by the plaintiffs in the instant case.

The foregoing quotations from the various authorities make it clear and plain that which is to be considered as merchandise and, therefore, dutiable, and that which is to be considered as vessels or parts thereof and, therefore, not subject to duty of any kind. Further comment by us would add nothing to the pronouncements made in the foregoing authorities. Applying the principles therein announced to the facts in the present case requires a holding that the involved propeller is not a vessel or a part thereof and, therefore, free of duty, but is merchandise within the provisions of the Tariff Act of 1930 and is, therefore, dutiable as assessed by the collector. All claims of the plaintiffs are, therefore, overruled. Judgment will be rendered accordingly.