No. 67304.—J. M. Rodgers Co., Inc., and Harris & Sons Steel Co. *v.* United States, protest 60/21660 (New York).

LAWRENCE, Judge: The merchandise which forms the subject of the above-enumerated protest is described on the invoice and entry papers as "Strip Mill Hot Rolled Scrap Second Hand Steel Coil Ends Pickled & Oiled." Upon importation from England, the collector of customs at the port of New York classified said merchandise as sheets of iron or steel, valued at not over 3 cents per pound, in paragraphs 307 and 308 of the Tariff Act of 1930 (19 U.S.C. § 1001, pars. 307 and 308), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and imposed duty thereon at the rate of 0.175 of a cent per pound, plus an additional duty of 1/10 of a cent per pound, pursuant to paragraph 309 of said act (19 U.S.C. § 1001, par. 309), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, by virtue of the fact that the involved merchandise had been pickled.

It is the position of plaintiffs herein that the involved merchandise should have been granted entry free of duty as metal scrap pursuant to section 1 of Public Law 869, 81st Congress, 2d session, as amended by Public Law 85–453, 85th Congress, 2d session.

The respective provisions of law are here set forth for ready reference.

Paragraph 307 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, *supra:*

Boiler or other plate iron or steel, except crucible plate steel and saw plate steel, not thinner than 0.109 inch, cut or sheared to shape or otherwise, or unsheared, and skelp iron or steel sheared or rolled in grooves; all the foregoing valued not over 3 cents per pound_____ 0.175¢ per lb.

Paragraph 308 of said act, as modified by the Torquay protocol, *supra:*

Sheets of iron or steel, common or black, of whatever dimensions, and skelp iron or steel; all the foregoing valued not over 3 cents per pound:
    Thinner than 0.109 but not thinner than 0.038 inch_____ 0.175¢ per lb.

   \*       \*       \*       \*       \*       \*       \*

Paragraph 309 of said act, as modified by the General Agreement on Tariffs and Trade, *supra:*

Plates or sheets of iron or steel, by whatever name designated, other than polished, planished, or glanced, which have been pickled or cleaned by acid, or by any other material or process, or which are cold-rolled, smoothed only, not polished, shall be subject to_____ 1/10¢ per lb. more duty than the rates provided on corresponding thicknesses of common or black sheet iron or steel

Section 1 of Public Law 869, 81st Congress, 2d session, as amended by Public Law 85–453, 85th Congress, 2d session:

Sec. 1. (a) No duties or import taxes shall be levied, collected, or payable under the Tariff Act of 1930, as amended, or under section 3425 of the Internal Revenue Code with respect to metal scrap, or relaying and rerolling rails.

(b) The word "scrap", as used in this Act, shall mean all ferrous and nonferrous materials and articles, of which ferrous or nonferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured * * *.

The only witness called to testify in this case was Harry Harris who appeared on behalf of plaintiffs. Harris, chairman of the board of Harris & Sons Steel Co. for 9 years and for more than 20 years prior thereto its president, testified that his company is engaged in steel processing and rolling and that he has served in all phases of the business, including buying, selling, inspecting, production, and so forth. Merchandise such as that in issue has been imported by Harris & Sons Steel Co. for the past 15 years and was described by the witness as rejected coil ends from the steel mills.

Harris was asked to describe how the imported product is arrived at by the process in the mill in England from which it is bought. It was his testimony that the steel mill starts with either an ingot or a slab. A slab, 18 inches to 3 or 4 feet wide, is subjected to a rolling process to reduce its thickness to 1/8th or 1/16th of an inch. It is hot rolled through the mill at a rate of up to 2,000 feet a minute. After hot rolling, the sheet is put through a "coiler" which forms the material into a coil. From the coiler, it is taken to a degreasing department where it is degreased. The coil of sheet steel is then subjected to a pickling process which consists of submerging the material in an acid bath for several hours. After pickling, it is oiled in some cases and then processed through a series of rollers to make it into the specific gauges called for by customers' purchase orders. In the latter process, due to the speed at which the mill operates, the first 300 to 1,500 feet and the tail end 300 feet is rejected by the mill as not being true to gauge and for various other reasons such as a tear in the steel which may have occurred in the coiling process, torn edges, laminations which occur due to a defect in the manufacture of the basic slab, splits in the steel, and eccentric gauge, where one side of the sheet may be thicker than the other. The imported merchandise consists of such rejected coil ends.

The merchandise is imported in an unwrapped condition which is not the case with prime steel. The majority of the coil ends arrive in a rusted condition due to exposure to weather and air, both at the mill abroad and during transportation to this country.

The witness explained that, after importation, his company opens the coil ends with a series of levers which straightens the material. The merchandise is examined and various defective portions are cut out. The remaining material is then rerolled into a coil, pickled, and degreased. After the degreasing process, the coil ends are heated and again rolled, ragged edges are cut off, and the material is again pickled to remove any scales on the steel. It is then sheared into the required sizes for sale to customers as a commercial quality steel, which might be used, for example, by manufacturers of refrigerators on backs of refrigerators which do not have to be of the same quality as the fronts or sides thereof.

Due to the rusted, torn, and laminated condition of the coil ends at the time of importation and due to waste which occurs during the reprocessing of the material in this country, 30 percent of the instant merchandise results in scrap which has no other purpose than to be remelted for remanufacturing purposes. The remaining 70 percent of the imported material is remanufactured by Harris' company and sold for commercial quality steel purposes, rather than as prime quality steel.

The witness testified that none of the instant material could be used in its original state as imported and is not suitable for any direct manufacture without further processing.

In addition to the testimony of witness Harris, the following exhibits were received in evidence on behalf of plaintiffs:

Illustrative exhibit 1—a photograph representing coil ends rejected by the mill abroad as unfit for its purpose and representative of the imported material.

Illustrative exhibit 2—photograph depicting the way Harris & Sons Steel Co. stores such imported merchandise.

Illustrative exhibit 3—a photograph of a coil from an importation substantially the same as the merchandise in issue.

Illustrative exhibits 4 and 6—photographs showing the inside of an imported coil with perforations therein which occurred in the mill during the process of pulling the steel onto a coiler.

Illustrative exhibit 5—a photograph of a coil end similar to those imported, one end of which has been opened.

Illustrative exhibit 7—a photograph showing a coil similar to the material imported with ragged edges and a split or crack in the coil due to the basic material being off analysis.

Collective exhibit 8—consists of two pieces of steel which had been cut from coil ends similar to the merchandise in issue and are representative of material Harris' company could not use in its remanufacturing process into commercial quality steel, but would be subjected to remelting.

From the foregoing facts, it is apparent that, at the time of importation, the instant merchandise was metal scrap within the unambiguous definition of that term contained in Public Law 869, *supra*.

The testimony of plaintiffs' witness Harris, which stands unrefuted, and the various exhibits in evidence disclose that the merchandise in issue consisted of materials or articles of which ferrous metal was the component material of chief value. It further appears that said merchandise was secondhand or waste or refuse, or was defective or damaged, since it consisted of torn, perforated, laminated, and otherwise unusable coil ends, which occurred in the process of producing hot-rolled steel in coils for prime steel purposes. It has been shown that the imported material is fit only to be remanufactured, 30 percent of the importation being, in fact, of no use other than for remelting for remanufacturing purposes and the balance of 70 percent being the subject of remanufacturing processes to produce a commercial quality steel. The record discloses further that the imported coil ends are not suitable for any direct manufacture without further processing and that none of this material could be used in its original state as imported.

Upon the record thus presented, it is clear that the requirements of section 1 of Public Law 869 have been satisfied.

Plaintiffs having overcome the presumption of correctness attaching to the collector's action and having amply supported their claim, we hold upon the record herein that the steel sheet coil ends in controversy should properly have been classified as metal scrap within the provisions of section 1 of Public Law 869, *supra*, as amended, and, accordingly, should have been granted entry free of duty. The claim of plaintiffs to that effect is, therefore, sustained.

Judgment will issue accordingly.