J. F. GOLDKAMP & COMPANY, Valley Steel Products Co., Plaintiffs,

v.

UNITED STATES, Defendant.

C.D. 3625; Protest Nos. 65/2649–1114 and 65/2645–1110.

United States Customs Court, Second Division.

Nov. 25, 1968.

Allerton deC. Tompkins, New York City, for plaintiffs.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Bernard J. Babb, New York City, trial attorney), for defendant.

Before RAO, Chief Judge, and FORD, Judge.

RAO, Chief Judge:

The issue presented for our determination here is whether an importation of certain metal goods from Mexico was properly classified by customs officials within the provisions of paragraph 397 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, as articles or wares, not specially provided for, whether partly or wholly manufactured, wholly or in chief value of iron, steel, brass, nickel, pewter, zinc, or aluminum, other, and, accordingly, assessed with duty at the rate of 19 per centum ad valorem.

Plaintiffs claim that the imported merchandise is entitled to free entry as metal scrap under the provisions of section 1 of Public Law 81–869, 64 Stat. 1093, as amended by Public Law 85–453, 72 Stat. 184.

In the alternative, plaintiffs claim that the merchandise is dutiable under paragraph 312 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas.Dec. 121, T.D. 52739. Further alternative claims were made that the merchandise should be classified under paragraph 301 and under paragraph 1555 of the same statute. However, plaintiffs have not offered any evidence at the trial nor addressed any arguments thereto in their brief, and, therefore, these claims will be considered abandoned.

The pertinent parts of the competing provisions are as follows:

Paragraph 397 of the Tariff Act of 1930, as modified by T.D. 54108—

Articles or wares not specially provided for, whether partly or wholly manufactured:

    \*    \*    \*    \*    \*    \*    \*    \*

    Composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum, or other base metal (except lead), but not plated with platinum, gold, or silver, or colored with gold lacquer:

    \*    \*    \*    \*    \*    \*    \*    \*

        Not wholly or in chief value of tin or tin plate:
        Carriages, drays,   \*   \*   \*

  \*    \*    \*    \*    \*    \*    \*    \*

        Other, composed wholly or in chief value of iron, steel, brass, bronze, zinc, or aluminum (except \* \* \*) ...............19% ad val.

---

Public Law 81–869, 64 Stat. 1093, as amended by Public Law 85–453, 72 Stat. 184—

Sec. 1(a) No duties or import taxes shall be levied, collected, or payable under the Tariff Act of 1930, as amended, or under section 3425 of the Internal Revenue Code with respect to metal scrap, or relaying and rerolling rails.

(b) The word "scrap", as used in this Act, shall mean all ferrous and non ferrous materials and articles, of which ferrous or non ferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured, but does not include such non ferrous materials and articles in pig, ingot, or billet form which have passed through a smelting process and which can be commercially used without remanufacture.

Sec. 2. Articles of which metal is the component material of chief value, other than ores or concentrates or crude metal, imported to be used in remanufacture by melting, shall be accorded entry free of duty and import tax, upon submission of proof, under such regulations and within such time as the Secretary of the Treasury may prescribe, that they have been used in remanufacture by melting: *Provided, however,* That nothing contained in the provisions of this section shall be construed to limit or restrict the exemption granted by section 1 of this Act.

Paragraph 312 of the Tariff Act of 1930, as modified by T.D. 52739—

Beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of columns and posts, and deck and bulb beams, together with all other structurel shapes of iron or steel:

  Not assembled,   \*   \*   \*

  Machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting ..........7½%   ad   val.

The record herein consists of the oral testimony of four witnesses and 11 exhibits and the official papers, which were received without being marked.

The following plaintiffs' exhibits were received in evidence:

Exhibit 1 is a representative sample of the pipe ends or tube ends imported by Valley Steel Products Company from Mexico.

Exhibit 2 is a representative sample of a coupling blank with slivers in it.

Exhibit 3 is a representative sample of a coupling blank with slivers and eccentricity.

Exhibit 4 is a representative sample of a coupling blank with an end recessed and with eccentricity.

Exhibit 5 is a representative sample of a rejected threaded coupling.

Exhibit 6 is a representative sample of a coupling blank which was partially manufactured.

Collective exhibit 7 consists of photographs of Mr. A. J. Strubel with several piles of couplings and coupling blanks purchased from mills in Mexico and elsewhere.

Collective exhibit 8 consists of two photographs of Mr. A. J. Strubel standing beside a heating furnace where some of the Mexican stock was processed.

Collective illustrative exhibit 9. A photograph of Mr. A. J. Strubel standing beside a press which was used in the processing of some of the Mexican stock.

Defendant's exhibits, A–1 and A–2, are letters addressed to the collector together with the official papers signed by the treasurer of Valley Steel Products Company indicating an intention that the Mexican importation will be melted and used for remanufacture.

Mr. A. J. Strubel was the primary witness to appear on behalf of the plaintiff. He testified that he was the vice president and general manager of Valley Steel Products Company, the importer herein, which firm is in the business of purchasing secondary materials for remanufacture and is the largest company in the world in the field, maintaining 10 plants in the United States. He explained that secondary materials generally include any product from a mill which is not primary, and include such articles as pipes, plates, couplings, and thread protectors. He stated that after processing the imported secondary materials, the resulting products are thread protectors, water-well casings, O.D. pipe, square and rectangular tubing, and drive shoes. Strubel further testified that some of the machinery which is used in the company's operations includes a draw bench, which is a machine that reduces the size or shape of pipe and presses for shaping material, heating furnaces used to reshape metal, a hot rolling mill to flatten the gauge of plates and tapping and boring machines and threading machines and various shears and decoilers for cutting metal.

The witness also testified that he is familiar with the merchandise at bar and that prior to its purchase by the company he had made trips to Mexico, where he inspected the mill of the exporter and observed its entire manufacturing operation. He there saw a pile of tubing in various lengths, some partially threaded and some completely threaded and some with slivers and seams, and arranged for the purchase of the entire accumulation of tubing ends and reject couplings and coupling blanks during 1957 and 1958. He stated that in his opinion there is no difference between the merchandise which he then saw and that described on the invoices herein.

The witness identified plaintiffs' exhibits 1 through 6 as tube ends, coupling blanks, and couplings purchased from the Mexican mill as scrap and selected by him from the Flora, Illinois, yard of Valley Steel Products Company on April 25, 1966, as representative of the nature of the articles coming from the Mexican shipment, although he was unable to identify them as coming out of the shipments before the court. Upon identify-

ing these exhibits he stated that they were defective due to either having eccentricities, slivers, or improper threading. He explained that an eccentric tubing end was one that had irregular wall widths and, therefore, could not be threaded and that slivers are deposits of carbon or foreign matter which may run through the whole piece of steel and which gives a seamed impression and prevents adequate threading. He further stated that the tube ends, couplings, and coupling blanks were imported from mills in Mexico and elsewhere in sizes ranging from 2 inches through 16 inches, and he identified plaintiffs' exhibit 7 as three photographs showing him standing next to the piles of couplings and coupling blanks at the company's Flora, Illinois, yard. He stated that all of this material is seamless steel and that oil well couplings are tubings which join pieces of pipe or casing, and that they must be strong, watertight and airtight to prevent earth from entering the production string and that the imported merchandise was not suitable for use as such as it was secondary material.

Strubel testified that after importation the merchandise was brought to the yard, inspected, and segregated into various categories and that some pieces, such as that represented by exhibit 1, were sold as scrap; that pieces like exhibit 2 were reduced in diameter and made into pipe thread protectors or couplings; that pieces like exhibit 3 and exhibit 4 could be made into such things as thread protectors, water well couplings and drive shoes. Exhibit 5 was identified by him as a rejected coupling because of defective threads, and exhibit 6, as a coupling blank obtained from Mexico which was improperly recessed. He testified that a pipe protector is a piece of steel put on the threads to protect them during shipment and that water couplings are used on casings and drilling of water wheels and that a drive shoe is a device threaded halfway down with a sharp bevel which is used in driving water well casing into the ground. He explained that in the case of thread protectors, if the threads are not too tight the couplings would be cut in half to make two couplings out of one. He stated that in order to make water well couplings the couplings would be bored on a boring machine and then rethreaded on the threading machine and that in some cases the size of the couplings would be reduced by heating them and pressing them into a smaller, more usable blank; that the blanks, after they are removed from the furnace in a cherry red condition, are placed under the opening of the press and the outside diameter is reduced by the pressure.

Strubel further testified that the production costs incurred by the work on the imported merchandise was substantial and that the processing changed the imported material into new commercial products; that some of the merchandise was sold and remelted, but he does not know what amount of the total importation these sales represented since no such records were kept.

On cross-examination Strubel testified that he arranged to purchase such merchandise in 1957, about three years before the instant entries, and that included in these shipments were coupling blanks, threaded couplings, dropped end tubing, and coupling stock and that he did not know how many of each category was included. He stated that his company paid $70 per metric ton for the imported merchandise and that he knows that the stock is oil well casings because of its dimensions and wall thickness, which dimensions range from 2 inches to 16 inches in diameter, and that some of the merchandise was sold to scrap dealers, but that he did not know how much was sold. He stated that in some cases couplings had to be rethreaded to be used as thread protectors; that those requiring rethreading were placed in the threading machines and the threads were rechased, but that rethreading was not always necessary. He stated that he did not know what percentage of the imported merchandise was heated and reshaped by the press; that in this process the pieces were not melted.

The witness stated that he purchased the instant merchandise by the ton and that he purchased the complete lot irrespective of size, quantity or type, and that it was shipped in 50-ton quantities.

Ruth Stewart, associated with J. F. Goldkamp & Company, one of the plaintiffs herein, was the next witness to testify on behalf of the plaintiffs. She testified that she was employed by Goldkamp in 1960 and that she prepared the entry papers herein and signed one of them. She stated that she attempted to make entry of the merchandise and that entry was refused in view of the fact that two letters, dated April 20, 1960, and June 1, 1960, marked defendant's exhibits A-1 and A-2, were not attached to the entry papers.

Mr. Lawrence A. Klick, a supervisory customs inspector, and Mr. Frank W. Durzenski, a customs agent, testified on behalf of the defendant. However, the substance of their testimony was excluded and, therefore, will not be summarized here.

It is plaintiffs' contention that the record establishes that the articles under protest, consisting essentially of steel tube ends, rejected couplings, and coupling blanks, which could not be used for their intended purposes at the time of importation due to various defects in their manufacture, were remanufactured into new commercial products and, therefore, are embraced within the meaning of the term "scrap" as used in section 1 of Public Law 81-869, as amended, supra.

On the other hand, defendant maintains that the merchandise at bar is not entitled to free entry as "scrap" within the purview of said section, as the plaintiffs have failed to establish that the imported merchandise at the time of importation was "fit only to be remanufactured" as this phrase is used in said tariff provision.

Since there appears to be no dispute herein that the controverted merchandise is composed of metal and that at the time of importation it was in a secondhand, defective, or damaged condition, the sole question to be determined is whether it was fit only to be remanufactured.

The tariff phrase "fit only to be remanufactured" as used in Public Law 81-869, as amended, supra, was one of the issues for determination in the case of Thornley & Pitt a/c Earl Investment Corpn. v. United States, 33 Cust.Ct. 136, C.D. 1645, and we quote the following from the decision in that case:

> Public Law 869, supra, is an amendment of, and finds its origin in, the act of March 13, 1942 (ch. 180, 56 Stat. 171), which, in substance, was a law granting free entry to scrap iron and scrap steel, as defined in paragraph 301 of the Tariff Act of 1930. The phrase "fit only to be remanufactured," found in Public Law 869, is a part of the terminology employed by Congress in said paragraph 301 to define scrap iron and scrap steel. The definition *in toto* reads as follows:

> \* \* \* That nothing shall be deemed scrap iron or scrap steel except secondhand or waste or refuse iron or steel fit only to be remanufactured.

> While the present enactment constitutes an enlargement upon the said tariff provision, the phrase "fit only to be remanufactured" is susceptible of no different construction under the later enactment than it possessed under the former.

In applying the view above expressed, the court in that case stated as follows:

> \* \* \* The mere statement of the witnesses that these articles were scrap, fit only to be remanufactured, is a conclusion which does not suffice to resolve this question. It becomes necessary to consider what processes were undertaken to restore the motor graders to a usefulness they did not possess at the time of importation. Actual use has a very important and pertinent bearing upon fitness for use, provided such actual use is not a trained, thwarted, unusual, or fugitive application.

Accordingly, in order to resolve the question presented here, it is necessary to consider what processes were undertaken by the plaintiffs to restore the rejected articles to usefulness and the actual use of the articles after their processing.

While plaintiffs' witness Strubel's mere testimony that the articles were scrap fit only to be remanufactured is a conclusion which does not suffice to resolve this question, his testimony reveals a considerable familiarity with the various processes undertaken by the importer to restore the defective merchandise to use and of the actual use of the finished product.

He testified that the rejected coupling blanks with slivers were put into a threading machine and the threads reclosed and made suitable for use as water couplings; that the coupling blanks which were defective due to improper recess were forged down and made into a smaller size coupling; that the rejected couplings with defective threads were rethreaded and used as water couplings; that the eccentric tubing with irregular walls which could not be threaded were heated and pressed, not melted, and then rethreaded. He did not know, however, the quantity or portion of the total importation which could be ascribed to any one of the said processes.

He stated that these various operations were conducted with the use of tapping and boring machines for the threading of couplings on the inside; that threading machines were used for threading the outside of the article; presses were used for shaping the articles; shears for cutting, and drawbacks to reduce the size of the pipe, and heating furnaces for reshaping.

He further testified that most of the imported articles, which were originally intended for use as oil well couplings and tube ends, were after processing actually used as tube ends and water couplings.

While the record does not disclose the difference, if any, of the standards, measures or grades between oil well couplings and water couplings, it is apparent from the aforementioned testimony that the basic structure of the merchandise at bar has not been altered to the point where its fundamental character has been changed by the processing operations. These articles have not attained a distinctive name, character, or use substantially different from that which they originally possessed before being subjected to the manufacturing process.

Moreover, the processes undertaken to restore the various rejected merchandise to usefulness consisted essentially of either a rethreading operation, or of a cutting and threading operation, or of a heating and rethreading operation. After these processes were performed the finished product possessed the same elementary form and substance as that possessed by the articles in their condition as imported.

In view of the above we are of the opinion that the articles at issue were not remanufactured, and, therefore, we do not agree with plaintiffs' contention that they are embraced within the meaning of the phrase "fit only to be remanufactured" as found in Public Law 81–869, as amended, supra.

The case of J. M. Rodgers Co., Inc. and Harris & Sons Steel Co. v. United States, 50 Cust.Ct. 164, Abstract 67304, cited by plaintiffs herein, is clearly distinguishable from the instant one. In the *Rodgers* case, the subject of the protest was invoiced as "Strip Mill Hot Rolled Scrap Second Hand Steel Coil Ends Pickled & Oiled". The coil ends were the result of the processing of steel in the mill. The importing company commenced a series of operations, opening the coil ends with a series of levers, cutting out defective portions and rerolling the remaining material into a coil, pickled and degreased. The coil ends were then heated and again rolled, ragged edges were cut off and the material was again pickled to remove any

scales on the steel. It was then sheared into the required sizes for sales to customers as a commercial quality steel which might be used by manufacturers of refrigerators on backs of the refrigerators. During the said reprocessing of the material 30 percent of the merchandise became scrap, to be remelted, and the remaining 70 percent was sold as commercial quality steel.

It is readily discernible that in the *Rodgers* case the resulting product was an entirely new commercial product, different in nature and use from the imported product, apart from the 30 percent which resulted in scrap, while in the instant case the resulting articles, after processing, had not lost their identity as couplings and tube ends.

■ Plaintiffs alternatively contend that the merchandise at bar should be classified under the provision of paragraph 312 of the Tariff Act of 1930, which covers "all other structural shapes of iron or steel", and cite the case of United States v. Winkler-Koch Engineering Co., 41 CCPA 121, C.A.D. 540, in support thereof.

In that case the merchandise was invoiced as "Seamless hot rolled A. P. I. Casings", which were hollow, cylindrical seamless sections made of steel by a hot rolling process, with the ends of the sections threaded so that they could be joined together to form a casing for an oil well. The question involved was whether the subject merchandise was properly classified for tariff purposes as structural shapes of steel advanced beyond rolling by machining, and fabricated for use, under paragraph 312 of the Tariff Act of 1930, or as "all other finished or unfinished iron or steel tubes not specially provided for", under paragraph 328 of the said tariff act. The court held that the oil well casings there in issue were properly classified as structural shapes of steel under paragraph 312 of the Tariff Act of 1930.

The merchandise at bar, however, is admittedly rejected or defective merchandise and in its condition as imported evidently incapable of use as oil well couplings. The *Winkler* case, supra, differs so much in its factual and legal aspects from the case at bar that it is deemed clearly distinguishable.

For the reasons above stated we find and hold that the merchandise at bar is not entitled to free entry as metal scrap within the provisions of said Public Law 81–869, as amended, supra. All claims in these consolidated protests are, therefore, overruled.

Judgment will be entered accordingly.