S. H. POMERANCE CO., INC., FOR ACCT. OF
NORMAN M. MORRIS WATCH CORP. *v.* UNITED STATES

**No. 7632.**—Invoice dated Bienne, Switzerland, March 1944.
Certified March 1944.
Entered at New York, N. Y., July 5, 1944.
Entry No. 700248.

(Decided December 2, 1948)

*James W. Bevans* for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Daniel I. Auster,* special attorney), for the defendant.

LAWRENCE, Judge: A very interesting and novel problem is presented by this appeal for reappraisement. The merchandise to which it relates consists of 727 complete watches which were imported from Switzerland.

Watches are not specifically enumerated in the Tariff Act of 1930. Neither are they dutiable as entireties. Watch movements are subject to duty pursuant to the terms of paragraph 367 (a) of said act at specific rates depending upon certain measurements and other details not important here, while watchcases are subject to duty under subparagraph (f) of said paragraph 367 at both specific and ad valorem rates.

Consequently, after the importation arrived at the port of New York, the United States Appraiser of Merchandise determined the value of the cases as well as of the movements.

It is not disputed that the invoice correctly states the respective values of the watch movements, of the cases, and of so-called "casing-up expenses" (hereinafter referred to as a casing charge) of 1 Swiss franc for each of the complete watches. In appraising the merchandise, one-half of said casing charge was included in the value of the cases and the other half included in the value of the movements. By stipulation of the parties (exhibit 1), the issue has been reduced to its simplest form and the sole question before the court is whether any part of the casing charge should be included in the value of the watchcases or whether the entire charge should be included in the value of the movements, it being agreed that "if any part of such casing charge is properly distributable to the watchcase, the appraised value is the correct value under Section 402 (c) and (d) of the Tariff Act of 1930." It is further provided in said stipulation "that if no part of such casing charge is properly distributable to the watchcase but in whole to the movement, then the value for duty purposes of the watchcases under said Section 402 (c) and (d) of the Tariff Act is the appraised value less that portion of such casing charge which the Appraiser has assigned thereto."

In view of the stipulation above referred to, which limits the issue to the proper allocation of the casing charge, it is obvious that the court is not confronted with the necessity of determining the various

elements of value which are not challenged. *United States* v. *Fritzsche Bros., Inc.*, 35 C. C. P. A. (Customs) 60, C. A. D. 371.

In addition to the stipulation (exhibit 1) above referred to, the plaintiff introduced an affidavit of Adolphe E. Vallat of Societe Anonyme Louis Brandt & Frere, Omega Watch Co., of Bienne, Switzerland. This was received in evidence and marked exhibit 2. So far as material here, deponent states that his company is engaged in the manufacture of watches and he is familiar with the watches shipped to Norman M. Morris Watch Corp., the actual importer herein, and added—

* * * that the watch cases in which the movements were cased were purchased in Switzerland from manufacturers of cases; * * * that the making of a complete watch comprises the fitting of the movement to the case and such case is delivered to the watch manufacturer by the case manufacturer as a finished and complete item, polished, checked, and ready to be allocated to a particular movement without any further operation on the part of the watch manufacturer with respect to the case itself; that in the process of casing a watch, the work done to fit the movement to the case is entirely performed on the movement itself, as, for example, the shortening of the stem and the fitting of the crown to the stem; that the cases delivered by the case manufacturer cannot be changed but it is the movement that must be adjusted to fit the case; that all of the foregoing statements apply to shipments which we have made to NORMAN M. MORRIS WATCH CORP. both prior and subsequent to the shipment referred to herein of March 1944.

Further reference to this affidavit will be made, *infra.*

Plaintiff also offered the testimony of Mr. Norman M. Morris, president of the importing corporation, and during the course of his testimony five watches were introduced in evidence as exhibits 3 to 7, inclusive, to illustrate certain operations in the process of assembling the several types of watches.

Mr. Morris testified that he had been importing watches for 24 years; that the shipment in question was purchased from the Omega Watch Co. of Bienne, Switzerland, the company represented by Mr. Vallat referred to in the affidavit, exhibit 2; that he had visited the manufacturer's place of business many times and had seen watches being assembled, observing carefully the nature of the work done in uniting the movements and the cases; that he has also imported watch cases and has seen movements inserted into those cases in this country. He stated that—

* * * There is no watch factory in Switzerland that makes the cases. There are individual jewelers who make the cases, but not the movement manufacturers. They know nothing about cases, so when we importers order watches from the factory, they make the movements and place the order for the cases with actually the case manufacturers. Now, after they receive the cases from the case manufacturers, they are prepared with the movements that they have manufactured in placing the movements into the cases, and of course make a complete watch. * * *

The gist of this witness' testimony was to the effect that watchcases and watch movements are the product of manufacturers who are independent of one another; that watchcases and movements are made with such precision in Switzerland that they are designed to fit together in the process of assembling the two products; that nothing remains to be done but to cut the stem to the proper length after the movement is inserted in the case and to adjust the crown. In explanation of the reason why the stem is not originally of the proper length, the witness testified—

Because cases vary. Some cases are thicker and require a little longer stem; others shorter, so they never know until they have the case. I will explain to you why these cases come to the manufacturer precisely accurate. When they place an order with the case manufacturer, they give him a steel block. That steel block is made of hard steel and is an exact duplicate of the movement as far as the outline, and shape and size is concerned, and that case maker works with that block all the time. When he manufactures the case he fits it in there and sees it fits exactly, so when the movement manufacturer receives these cases, they are precisely accurate. Nothing has to be done. They are not to be touched.

With further reference to the length of the stem, the witness testified on cross-examination—

X Q. And how can you determine whether it is short or long? What do you do to determine that?—A. Your own judgment.

X Q. What do you do? Do you place the movement into the case before you can determine that, or don't you have to do that?—A. Yes, you place the movement into the case.

X Q. After you place the movement into the case, then you determine for the first time whether it is long or short or correct?—A. That is right.

X Q. So that you must handle the case before determining whether the stem is long, short, or correct?—A. Yes, sir.

and further—

May I add this just to clarify my point? You asked the question whether I have ever seen any work done on the case. May I say this, that in Switzerland they work so accurately that if the watchmaker—watch manufacturer—receives a shipment of cases on an order for the movements that he is to insert in those cases, and if they do not fit accurately, back they go. That is a very common occurrence. The movement must fit into that case perfectly, and if it doesn't in the slightest, it goes back to the case-maker, and he has to do his own fitting to make it fit properly.

\* \* \* \* \* \* \*

Let me explain further. The case-maker delivers the cases in the rough at first without being polished and without crystals. The watch manufacturer, or the movement manufacturer takes those cases and he sees whether they fit properly. If they do, he returns them for polishing and has crystals fitted, and then the case-maker delivers them all ready. All he has to do is put the movement in because he has already tried the movement in there when it came in, and when the watch manufacturer returns those cases in the rough to the case manufacturer they are supposed to fit perfectly because that is the purpose of sending them in the rough, to try it, and then he does the polishing, etc. When they are delivered finished by the case-maker, they are polished, the crystal is

on, and there is absolutely nothing to be done but slip the movement into the case.

It appears further that the crystal or glass covering of the completed watch is supplied by the case manufacturer.

The defendant introduced the testimony of Mr. Aaron Balmages, a watch expert employed in the United States Appraiser's Stores, Port· of New York, for the past 7 years.

This witness testified that the steps necessary to case watches in the United States is the same as outlined by the witness Morris; that in his experience, to case exhibit 7, for instance, the assembler would have to open the case, put the movement in, cut the stem to size, and check to see whether it fitted in the slot in the case. If it did not, it would be necessary "to file out the bottom, as I see in this case, and the top. Then, cut the stem to size, fit on the crown, and then close the case."

The witness further testified with regard to the steps employed in assembling movements and cases in watches of the types represented by exhibits 3, 4, 5, and 6. Since subsequent testimony gives these steps in greater detail, reference to the assembling of said watches will not be made at this point.

The witness also stated that in the process of casing any one of these exhibits, it was necessary to expend time and effort on both the cases and the movements.

For clarification of the process of assembling exhibits 3, 4, 5, and 6, further testimony was received from plaintiff's witness Morris. He stated, with regard to exhibit 3, that the case is water-resistant and consists of four independent parts; namely, the bezel which is the part that holds the crystal; the back; the movement ring which holds the movement in place; and the extra pan which gives added protection by keeping the movement in place in the bezel and possibly tends to keep the watch waterproof. He also stated that there is no slot in the bezel of exhibit 3 (which does appear in exhibit 7) whereby the movement may be inserted in the case with the stem attached. In assembling exhibit 3, the stem has to be removed before the movement is placed in the case. After the stem is cut to proper size, it is put through the hole in the case and attached to the movement. Then a point is filed on the opposite end of the stem to permit the affixing of a crown. The movement having been placed in the bezel and ring, the stem inserted, and the crown affixed, the dust pan is added and the back of the case is screwed on.

The witness testified that the stems are not made to proper length before actual assembly begins because the necks of the cases vary; some are longer, some shorter. He also stated that he would not necessarily say that it takes skilled labor to assemble a watch, but

that in Switzerland, women are trained to do this particular type of work.

The witness then stated that exhibit 5 is a lady's watch having a waterproof screw-back case, and the manner of assembly is practically the same as in exhibit 3, with the exception that there is no pan but that there are little flanges or springs on the ring which serve the same purpose. With reference to the back of the case of exhibit 5 and also exhibit 3, he stated that there are several projections or holes for the insertion of a special key which must be used to open and close the back of these cases in order to waterproof the watches.

With reference to exhibit 6, the witness testified that it is a man's water-resistant type watch, also known as friction-type. To case a watch of this type, he stated that the case is first separated into its four parts; namely, the bezel, crystal, ring, and the back; then the movement is fitted into the back of the case, the ring is placed on top of the movement, the crystal is pressed into place, and the bezel is snapped on. He added that this exhibit has what is called a split stem, which comes in two sections, one of which is inside and connected with the movement while the other portion of the stem is connected to the crown. He stated that the work is done in this instance on the small part of the stem remaining in the crown; that the stem is cut down to allow it to fit in the crown.

As to exhibit 4, the witness testified that it is similar to exhibit 6, the only difference being that exhibit 4 has a small second hand while exhibit 6 has a full sweep second hand, but that they are identical with respect to the number of parts and the process of assembling them. As to those exhibits, as well as with respect to exhibits 3 and 5, he added that the crown can only be applied after the movements are actually inside the cases.

The description of the process of assembling the watches in controversy represented by exhibits 3, 4, 5, 6, and 7 has been set forth in considerable detail by reason of the insistence of plaintiff that in assembling cases and movements the work performed is related solely to the movement itself. As stated in the affidavit of Adolphe E. Vallat (exhibit 2, *supra*), "in the process of casing a watch, the work done to fit the movement to the case is entirely performed on the movement itself," and it is further stated, "for example, the shortening of the stem and the fitting of the crown to the stem; that the cases delivered by the case manufacturer cannot be changed but it is the movement that must be adjusted to fit the case; * * *."

From an examination of the testimony of witnesses Morris and Balmages, *supra*, it is at once obvious that a great deal of labor is expended in resolving the watchcases into their parts before inserting the movements, and later in restoring the cases to their completed form to make finished watches.

It is clear that the amount of time and labor expended on exhibit 7 is not as extensive as that with respect to exhibits 3, 4, 5, and 6, some of which have four or five parts which must be taken down and subsequently replaced. While these operations, according to witness Morris, do not require "skilled" labor, it nevertheless must be performed by "trained" labor.

In saying that "the work done to fit the movement to the case is entirely performed on the movement itself," as stated by affiant Vallat (exhibit 2), the witness must have entirely ignored the very substantial labor employed in taking apart and reassembling the cases.

The only authority relied upon by the plaintiff in support of its contention is *Hayes* v. *United States*, 150 Fed. 63, (T. D. 27806), which is clearly distinguishable. That case dealt with an importation of olive oil in bottles. No question was raised as to the duty imposed on the oil itself, under paragraph 40 of the Tariff Act of 1897, nor as to the duty upon the glass bottles containing the oil, as provided for in paragraph 99 of said act. The controversy involved the action of the collector in treating corks, capsules, and labels as parts of bottles, and in apportioning other charges for reed envelopes, wooden cases, and filling and packing cases, between the value of the oil and the value of the bottles, and assessing duty upon the part of such charges which was apportioned to the bottles.

The court there ruled that the corks, capsules, and labels were in no sense glass or glassware or glass bottles and were not within the purview of paragraph 99, *supra*, as classified by the collector. As to the apportioning of the packing charges, the court stated, at page 69—

We are of the opinion that in determining the gross amount of duties to be assessed upon a case of olive oil under paragraphs 40 and 99, by the sounder construction section 99 must be held to require a determination only of the value of the glass bottles containing the olive oil, without the addition of any portion of the value of the cases and coverings, all of which are the necessary and usual coverings of the olive oil, since these are provided for by paragraph 40. As a matter of common sense, the imposition of a tax on glass bottles does not have the effect of requiring any different kinds of cases or coverings for olive oil in bottles, and does not require that additional or other cases or coverings be provided for the glass bottles, since they need only the same cases and covering that protect the olive oil. It is improper to apportion any part of these cases to the bottles, for the reason that this is in effect to say that this part is not, as a substantial matter, essential for the protection of the oil. The theory of apportionment of cases breaks down when it is so applied as to increase the duties and as to deny what is the fact—that the entire cases and coverings are the essential and usual protection of the oil. The theory that a part of this protection can be separated and apportioned to the bottles loses sight of the fact that the remaining part would be an insufficient protection for the oil.

It will be seen that the case of *Hayes* v. *United States, supra*, bears no analogy to the circumstances of the present case. The casing-up charge here in controversy was not an incident to the preparation for transportation of the watches, since the cases and movements could have been shipped separately, but constituted time and labor expended on the watchcases and watch movements, separately dutiable commodities, in combining them to form watches, which were then packed and prepared for shipment.

The suggestion of plaintiff that watch movements are time-keeping mechanisms in themselves and that the cases are merely in the nature of coverings, as that term is employed in the *Hayes* case, *supra*, seems wholly untenable. While it may be true that watch movements could, if carefully protected otherwise than in ordinary watchcases, keep time, nevertheless, that is not a common, practical, commercial utility for watch movements.

It is plaintiff's contention that it is immaterial that the watchcases must be opened in order to insert the movements as this does not constitute work done on the cases. The casing charge, as its name denotes and as is borne out by the record before me—no other meaning having been attributed to those words—is composed of the labor cost of combining the watch movements and the watchcases in order to make completed watches. The record before me indicates that this work is done by trained workers and it is logical to conclude that all steps performed in assembling the watch movements and the watchcases form a part of said casing charge. The watchcases are delivered to the movement manufacturer in a completed form and preparatory to insertion of the movements it is necessary that the cases be taken apart. The process of assembly entails the combining of the various parts of the cases with the movements, and, where necessary, clipping the stems to the proper length and attaching one end to the movements; then nipping the opposite ends of the stems and affixing the crowns to them. As a final step, the cases are closed, which in the instance of exhibit 7 merely entails snapping the back of the case in place; in exhibits 4 and 6 it involves attaching the bezel; and as to exhibits 3 and 5 it requires tightening the back of the cases with a special key as a waterproofing measure. Truly it can be said that a watch assembler in the performance of his duties devotes considerable effort and time to the watchcases as well as to the watch movements.

If the watchcases and watch movements were imported separately, there would have been no casing charge. Since the cases and movements were assembled abroad, resulting in a 1-franc casing charge which the appraiser has distributed equally to the cases and the movements, to ignore said enhancement of the value of the cases as

well as of the movements by combining them into entireties as watches would be to overlook one of the underlying purposes of the Tariff Act of 1930, which, as stated in the preamble to said act, reads:

An Act To provide revenue, to regulate commerce with foreign countries, *to encourage the industries of the United States, to protect American labor,* and for other purposes. [Italics supplied.]

If the theory of plaintiff were to be approved, it would seem to follow that watchcases when imported with movements uncased would be appraised at the same value as corresponding watchcases containing movements when imported. It is not believed that such was the intent of Congress.

After a careful consideration of the record and exhibits herein, I find as matter of fact that, in the process of assembling the watchcases and watch movements to which this appeal relates, the casing charge represents time and effort which trained personnel expended on the cases as well as on the movements, and that a portion of that expense was properly included in the value of the watch cases by the appraiser. It is not necessary for me to determine the proportionate share of said charge allocable to the respective parts of the imported watches. By agreement of counsel for the respective parties (exhibit 1) "if any part of such casing charge is properly distributable to the watch case, the appraised value is the correct value under Section 402 (c) and (d) of the Tariff Act of 1930." I therefore hold as matter of law that the appraised values are the correct values of the watchcases as well as of the watch movements under the provisions of sections 402 (c) and (d) of the Tariff Act of 1930.

Judgment will issue accordingly.