(C. D. 2007)

NANCO, INCORPORATED *v.* UNITED STATES

United States Customs Court, Third Division

(Decided June 17, 1958)

*Stein and Shostak (Marjorie M. Shostak* of counsel); *Bernard B. Laven,* associate counsel; for the plaintiff.

*George Cochran Doub,* Assistant Attorney General (*Joseph E. Weil* and *Sheila N. Schwartz,* trial attorneys), for the defendant.

Before JOHNSON, DONLON, and RICHARDSON, Judges

JOHNSON, Judge: This is a protest against the collector's assessment of duty on watches imported from the Philippine Islands and entered at the port of Los Angeles December 10, 1946, at various rates under paragraphs 367, 1211, 1527, and/or 1531 of the Tariff Act of 1930, as modified. It is claimed that the merchandise consists of Swiss watch movements which were manufactured in the United States into watches with the use of American cases; that said merchandise is, therefore, of American manufacture; and that it is entitled to free entry under paragraph 1615 (a) of the said tariff act, as amended, as American goods returned. An alternate claim, that the merchandise constitutes a nonimportation, was abandoned at the trial. Also abandoned were all claims with respect to waterproof and chronograph watches (consisting of foreign movements and cases imported in the form of complete watches) contained in package 55.

While this merchandise was imported in 1946, the entry was not liquidated until March 12, 1954. Protest was timely filed, and hearings were held in Los Angeles in September 1955 and September 1956. Counsel requested time to submit briefs, which briefs were filed on December 30, 1957, February 28, 1958, and March 7, 1958.

The issue in this case is whether or not the merchandise is entitled to free entry as American goods returned under paragraph 1615 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, which reads as follows:

PAR. 1615. (a) Articles, the growth, produce, or manufacture of the United States, when returned after having been exported, without having been advanced

in value or improved in condition by any process of manufacture or other means. [Free.]

\*     \*     \*     \*     \*     \*     \*

(e) The foregoing provisions of this paragraph shall not apply to—

(1) Any article upon which an allowance of drawback has been made under section 313 of this Act or a corresponding provision of a prior tariff Act, unless such article is in use at the time of importation as the usual container or covering of merchandise not subject to an ad-valorem rate of duty;

\*     \*     \*     \*     \*     \*     \*

(h) The allowance of total or partial exemption from duty under any provision of this paragraph shall be subject to such regulations as to proof of identity and compliance with the conditions of this paragraph as the Secretary of the Treasury may prescribe.

The regulations prescribed by the Secretary of the Treasury, in effect at the time of this importation, are as follows (Customs Regulations of 1943, as amended):

**10.1 Requirements on entry.**—(a) The following documents shall be filed in connection with the entry of articles claimed to be free of duty under paragraph 1615, Tariff Act of 1930, as amended:

(1) A declaration of the foreign shipper on consular Form 129 (Invoice of Returned American Goods and Declaration of Foreign Exporter) certified by the American consular officer, if the value exceeds $100. An invoice on consular Form 138 shall not be required if consular Form 129 is filed within the period provided for in these regulations.

(2) An affidavit of the owner, importer, consignee, or agent on customs Form 3311.

(3) A certificate, customs Form 4467, of the collector of customs at the port from which the merchandise was exported from the United States. Such certificate shall show whether drawback was claimed or paid on the merchandise covered by the certificate and, if any was paid, the amount thereof. \* \* \*

\*     \*     \*     \*     \*     \*     \*

**10.2 Waiver of evidence.**—(a) The collector may waive record evidence of exportation and the declaration of the foreign shipper on consular Form 129 provided for in section 10.1 (a) (1) if he is satisfied by the production of other evidence as to the existence of all the facts upon which the entry of the merchandise under paragraph 1615, Tariff Act of 1930, as amended, is dependent. However, an invoice on consular Form 138, or a bond for the production thereof within 6 months from the date of entry, shall be required unless the article is otherwise exempt from the requirement that such invoice be filed. Should consular Form 129 be produced within the 6-months' period instead of consular Form 138, it may be accepted in cancelation of the bond.

When this merchandise was shipped to the United States, apparently no detailed invoice accompanied the packages, and an invoice was prepared in customs bonded warehouse. Counsel for the respective parties stipulated at the trial:

\* \* \* That the invoice listing the articles returned to the United States covered by this case was prepared in Customs bonded warehouse, under Customs

supervision, pursuant to permission obtained from the Collector of Customs at Los Angeles, to open the packages prior to entry to determine their contents.

Roscoe A. Rundio, who was general manager of the plaintiff corporation in 1946, testified that he and a Mr. Wilkins, comptroller of the company, examined the merchandise in customs warehouse in the presence of a customs representative. They counted and inspected the merchandise, grouped together watches of the same type and style case, and opened the backs of one, two, or three watches in each group. Mr. Wilkins, under Mr. Rundio's supervision, made an invoice or inventory of the merchandise, describing it and noting the names which were marked on the movements and the cases. Those on the cases are listed as Rex, I. D. Watch Case Co., Fit-Rite, Commodore, Master, Nuvel or Newell Mfg. Co., Duro Watch Case Co., N. S., Elite Watch Case Co., Acme, Anchor Case Co., Star Case Co., D. O., and S-K. Photostatic copies of the invoice thus prepared were received in evidence as plaintiff's collective exhibits 2 and 2-A.

According to Mr. Rundio, the watches consisted of Swiss movements and American cases. He said they were in horrible condition, some of them being so rusted that the cases could not be opened. The crystals were broken, a lot of the movements were frozen, and the bands were broken.

It is claimed by the plaintiff that the watchcases involved herein are of domestic origin; that they were used with foreign movements in the production of complete watches in the United States; that the watches listed on plaintiff's collective exhibit 2 were a part of a quantity of merchandise which was purchased by Nanco, Incorporated, in New York and Los Angeles, shipped to its branch in Honolulu in May and June 1946, taken from there to the Philippine Islands by Robert Buda, one of its salesmen, on or about June 19, 1946, and returned by Buda from Manila to Nanco in Los Angeles; that such complete watches are entitled to free entry under paragraph 1615 of the Tariff Act of 1930, as amended, as American goods returned, without having been advanced in value or improved in condition while abroad; and that the applicable regulations have been complied with as far as possible.

Defendant contends that plaintiff has failed to prove the origin of these articles or their identity with exported merchandise; that the evidence is insufficient to establish that the assembly of the watchcases and movements constituted a manufacturing process; and that the regulations have not been complied with.

The record herein consists of 357 pages, covering the testimony of 7 witnesses, and 12 exhibits. The evidence will be referred to as necessary in the course of this opinion. A motion made by the Gov-

ernment to strike out the testimony of the witness Edward Neuwirth is denied.

According to the record, Nanco was not an importer of watches, but purchased complete watches in the United States in 1946, consisting of foreign movements assembled in American-made cases, except for waterproof and chronograph watches not involved herein. The witnesses who made the purchases testified that they knew that the cases were of domestic origin, because they had bought them from domestic manufacturers of watchcases, because of various characteristics of domestic watchcases which they recognized from their experience in the trade, and because there were no markings showing any foreign country of origin.

The buyers Edward Neuwirth and Jerry Jerome explained that domestic cases were made of rolled gold-filled material, of 10-, 12-, or 14-carat gold, whereas foreign cases generally were in 18- or 22-carat gold; that, in 1946, no cases of 14-carat gold and rolled gold were manufactured outside the United States. The foreign cases had a kind of coppery color that was not liked in this country and were mostly round, whereas the trade preferred an oblong watch. Foreign-made cases had solid lugs, which meant that the straps were permanently fastened, but American-made cases had removable lugs, so that the bands could be replaced easily. Many of the American cases had a trade-mark or symbol of the manufacturer on them.

Jack Niaman, who was engaged in the watch importing business in 1946 under the name of the Rogers Watch Co., testified that he imported movements only and assembled them with cases procured in New York. He knew that the cases he purchased were American made, because of his experience in the business, visits to factories, and the style and price of the cases. He identified the following as companies that manufactured cases in the United States: Commodore, Master, Nuvel, D–O (D. Ornstein), S–K, Epstein & Son, Rex, I. D. Watch Case Co., Fit-Rite, Duro Watch Case Co., Elite Watch Case Co., Acme Watch Case Co., and Star Watch Case Co. Most of these firms are listed as manufacturers in the Jewelers' Buyers Guide (plaintiff's exhibit 3), a book used in the trade as a guide in the purchase of parts to assemble watches.

It was stipulated at the trial that the appraiser did not find any evidence on the cases that they were of foreign origin or manufacture. The examiner's aide, Norman F. Roth, testified that had the examiner found any marking on the cases indicating country of origin, he would have advised the witness, who would have made a notation to that effect on the invoice. In this connection, it is to be noted that paragraph 367 (g) of the Tariff Act of 1930 requires that all foreign cases

have cut, engraved, or die sunk on the inside of the back cover the name of the manufacturer and the country of manufacture.

We conclude, therefore, that the watches purchased by Nanco in 1946, except chronograph and waterproof watches, had American-made watchcases.

The next question is whether those cases and the foreign movements were so processed in the United States as to constitute watches produced or manufactured in this country, within the meaning of paragraph 1615 (a), *supra*. Evidence as to what was done in encasing the foreign movements is found in the testimony of Jack Niaman as follows:

Q. Now, what procedure did you follow, Mr. Niaman, after you bought the movements and bought the cases?—A. Why, I had the watchmaker assemble the movements in the cases.

Q. And what processes did he follow, or procedure did he follow in doing that?—A. Well, he has to do some filing to have the movement fit in, and file the stem, and assemble the crown on the stem.

In support of their contentions, both parties rely upon the case of *Adolphe Schwob (Inc.)* v. *United States*, 62 Treas. Dec. 248, T. D. 45908, affirmed *sub nom United States* v. *Adolphe Schwob, Inc.*, 21 C. C. P. A. (Customs) 116, T. D. 46447. The question there was whether drawback should be allowed where imported watchcases and imported watch movements were assembled into watches in this country. The watchmaker testified that, upon receipt of the parts, he opened the case, drilled holes in it to make a place for the winding stem, cut the stem to fit a crown on it, secured the stem with the crown in the movement, fitted the movement into the case, and closed the case. He said there was nothing exceptional in the work he had done; that it was the regular way of making a watch. The court held that drawback should have been allowed, stating that the labor performed in adjusting the parts so as to unite them into a completed watch was more than mere assembling of such parts and that the watches were manufactured in the United States with imported merchandise. The court pointed out that the cases, movements, stems, and crowns were distinctive parts, each known and bought and sold by its respective name until they were united into one unit, thereafter called a watch. On appeal, the question as to whether the goods were manufactured in the United States was waived by the Government, and the decision of the trial court was affirmed.

Since that time, drawback rates have been consistently promulgated by the Secretary of the Treasury covering watches manufactured in the United States with the use of imported watch movements and/or watchcases or watch heads. 74 Treas. Dec. 106, 109, T. D. 49672–N; 75 Treas. Dec. 359, 361, T. D. 50126–L/N; 80 Treas. Dec. 30, 32, T. D.

51194–F; 86 Treas. Dec. 108, 110, T. D. 52727–G; 90 Treas. Dec. 348, 350, T. D. 53931–I.

The evidence in this case indicates that the watchmaker employed by Mr. Niaman did much the same type of work as the watchmaker in the *Schwob* case. The latter testified that that was the regular way of making a watch. See also *S. H. Pomerance Co., Inc., etc.* v. *United States*, 21 Cust. Ct. 334, Reap. Dec. 7632, affirmed 28 Cust. Ct. 515, Reap. Dec. 8073, which, while involving a question of appraisement, discusses at length the method of assembling watchcases and movements.

It has long been held that to constitute a manufacture it must appear that the processing applied produced an article with a new name, character, or use. *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963; *United States* v. *Wilkinson Process Rubber Sales Corp.*, 22 C. C. P. A. (Customs) 60, T. D. 47051; *H. Muehlstein & Co., Inc., et al.* v. *United States*, 44 C. C. P. A. (Customs) 107, C. A. D. 645. The uniting of a watchcase and a watch movement into a complete watch results in an article having a new name, character, and use. When this operation is performed in the United States, the finished article is the product or manufacture of the United States.

The next question concerns the identification of the imported merchandise with American-made watches previously exported. The witness Rundio, who examined the merchandise when it came in, stated positively that it consisted of watches which his company had shipped to Honolulu in May and June 1946. He testified that he recognized the names on the invoice, plaintiff's collective exhibit 2, as sources from which watches had been purchased by Nanco in New York and Los Angeles. He said that the merchandise had come into the Los Angeles office where he inspected it. At that time, the backs of the watches were opened, and the watches were timed and checked to verify quantity, style, type, and gold content. The witness said he remembered this merchandise and that the watches which came in from the Philippines were the same watches, which watches had been purchased in the United States and shipped to Nanco's Honolulu branch. He added that he had examined all of the invoices covering the purchase of these watches, both in Los Angeles and New York, and had reconciled the watch or watches as to the type, number of jewels, and price, and found that all of the watches listed on plaintiff's collective exhibit 2 were purchased by Nanco in Los Angeles or New York prior to transshipment to Honolulu.

The witness stated that his firm had a system of transferring merchandise from New York to Los Angeles and then to Honolulu and keeping records of the same, but that the books were destroyed in a fire in Long Beach in the late fall of 1946. A copy of one such

transfer-of-merchandise form, dated June 6, 1946, that accompanied goods shipped from New York to Honolulu, was obtained from the Honolulu branch and produced at the trial (plaintiff's exhibit 4). The witness identified some of the watches included in this document with items on plaintiff's collective exhibit 2 by means of style and type of watch, gold content, and price. There was also received in evidence a duplicate invoice from Acme Watch Co., dated June 4, 1946, for 500 pocket watches (plaintiff's exhibit 5). The witness was positive that item 57 of plaintiff's collective exhibit 2 included some of these watches, for the reason that he had purchased no other pocket watches and that such purchases were rare.

Mr. Niaman identified watches covered by 16 items on plaintiff's collective exhibit 2 as watches which he had sold to Nanco, under the names "Rogers" or "Royce." He pointed out that no one else could have imported watch movements under the Rogers name, and that he had a symbol of his own (UXC) issued by the Swiss Watch Federation. This symbol is noted on plaintiff's exhibit 2 in connection with six items.

Mr. Niaman and Mr. Rundio testified that the invoices in plaintiff's collective exhibit 1 covered merchandise sold to Nanco by the Rogers Watch Co. Subsequently, Mr. Rundio wrote certain numerals on the invoices to indicate merchandise which he had identified with watches on plaintiff's collective exhibit 2, where, under the unit cost and amount column, he placed the same identifying numbers. An examination of the documents discloses, for example, that the number "12" appears on invoice No. 13416, covering 60 ladies' 14K 17J watches at $22.50, to sell at $30.35, and the same number is in the unit price column of plaintiff's collective exhibit 2, as to item 84, covering 14 Rogers Watch Co., ladies' 14K 17-jewel wristwatches at $30.35.

Fred Gaebler, who was employed as a salesman by Nanco in Honolulu in 1946, testified that the transfer-of-merchandise form, plaintiff's exhibit 4, covered merchandise which was received by Nanco in Honolulu on June 13, 1946. He said that most of it was packed in boxes there by another employee and himself and that the boxes went to Manila. In addition, other watches were set aside for transfer to Manila. On June 13, 1946, he executed Shipper's Export Declaration No. 439 (plaintiff's exhibit 7) before a customs officer in Honolulu. Said declaration covers 4,612 watches with jewels, valued at $69,180, to be shipped by Pan American World Airways System from Nanco in Honolulu to Robert F. Buda in Manila. The witness stated that the customs officer retained some copies and that he (Gaebler) took this copy (plaintiff's exhibit 7) back to the Nanco office. According

to the witness, the watches went to Manila the following day, or on June 19, by Pan American plane, and Mr. Buda accompanied them.

A letter from the collector at Los Angeles to the Commissioner of Customs, dated December 19, 1949 (plaintiff's exhibit 11), states:

This office would be inclined to recommend favorable consideration of the petition, in view of the facts surrounding the exportation and importation of the watches and other items, and *being reasonably sure that the merchandise imported was the same that was exported.* [Italics supplied.]

In our view, the evidence presented is sufficient to identify the imported merchandise with watches previously shipped by Nanco to Honolulu and from there to Manila. Mr. Rundio, who examined the merchandise on its arrival in Los Angeles, was positive that it was the same merchandise which his firm had sent out. His statements are uncontradicted and are supported by other evidence in the record. They are not unworthy of credence, when it is remembered that the witness had been in the business for several years and had accompanied the buyers on many occasions; that the watches themselves were of various types; that they consisted of movements and cases of different manufacturers; that, in some instances, at least, the purchaser had selected the movements and the cases separately and ordered them assembled.

According to the record, the watches had not been advanced in value or improved in condition while abroad. On the contrary, they had deteriorated and were returned in poor condition.

The last question involves compliance with the regulations issued by the Secretary of the Treasury pursuant to section 1615 (h), *supra.*

These regulations provide that there shall be filed in connection with the entry a declaration of the foreign shipper on consular Form 129, an affidavit of the owner on customs Form 3311, and an export certificate on customs Form 4467. It is further provided that the collector may waive record evidence of exportation and the declaration of the foreign shipper if he is satisfied as to the existence of all the facts upon which the entry of merchandise under paragraph 1615 depends.

In the instant case, customs Form 3311 was filed within the bonded period.

Neither party has mentioned consular Form 129, which does not appear among the official papers. Since the Government does not claim noncompliance with the regulations on the ground of failure to produce this form, we assume that it was filed or that its production was waived. *Close & Stewart* v. *United States*, 11 Cust. Ct. 14, 16, C. D. 784.

The controversy centers around the certificate of exportation, customs Form 4467. It appears that, on or about April 15, 1948,

customs Form 3833 was sent to the collector at Honolulu, referring to enclosed photostatic copies of shipper's export declaration Nos. 438 and 439 and a certificate of exportation (customs Form 4467), and requesting the completion of the certificate. The collector's reply states:

Certificate of exportation as above requested with this exception: According to the records of this office, Shipper's Export Declaration No. 439 was neither manifested nor returned by Pan American Airways.

Consequently, the collector did not issue a certificate of exportation with regard to the merchandise listed on shipper's export declaration No. 439.

It is well settled that compliance with the regulations is a condition precedent to free entry under paragraph 1615 (a), *supra*, unless compliance is waived by the collector or is impossible. *Maple Leaf Petroleum, Ltd.* v. *United States*, 25 C. C. P. A. (Customs) 5, T. D. 48976; *Thornley & Pitt a/c Earl Investment Corpn.* v. *United States*, 33 Cust. Ct. 136, C. D. 1645; *United States* v. *Coastwise Steamship & Barge Co.*, 9 Ct. Cust. Appls. 216, T. D. 38047; *Close & Stewart* v. *United States*, *supra*; *Mine Safety Appliances Company* v. *United States*, 36 Cust. Ct. 277, C. D. 1786.

In the instant case, there has been no waiver, but, since the collector at Honolulu has refused to issue a certificate of exportation, it is impossible for the plaintiff to obtain one. The question then presents itself as to whether sufficient evidence in lieu of such certificate has been produced.

In some cases where it was impossible to obtain a certificate of exportation, substitute documentary evidence has been accepted. *Minneapolis Barrel & Bag Co.* v. *United States*, 51 Treas. Dec. 187, T. D. 42006; *New York Dress & Costume Co., Inc.* v. *United States*, 73 Treas. Dec. 1258, Abstract 38432; *Draeger Shipping Co., Inc.* v. *United States*, 2 Cust. Ct. 676, Abstract 41131; *Close & Stewart* v. *United States*, *supra*.

In *United States* v. *Coastwise Steamship & Barge Co.*, *supra*, the facts were established by oral testimony.. There, an American marine engine which was taken from a wrecked American vessel and repaired in Canada was claimed, on its return, to be entitled to free entry as American goods returned, except as to the value of the repairs. The Government contended, among other things, that free entry could not be allowed because no certificate of exportation was made by the collector or noted on the manifest. The court held that since it was impossible to identify the article in accordance with the regulations, its identity might be, and was, established by other satisfactory evidence.

In the instant case, there is positive testimony identifying the imported merchandise with watches purchased by Nanco in New York and Los Angeles, which watches were manufactured in the United States with American watchcases and foreign movements. There is also evidence establishing that they were sent to Honolulu where a shipper's export declaration was prepared and signed by the witness Gaebler on June 13, 1946. According to this document, the watches were to be shipped to Manila via Pan American World Airways. The instant merchandise arrived in San Francisco from Manila on October 10, 1946, and entry was made in Los Angeles on December 10, 1946. According to the witness Rundio, the merchandise had been returned by Robert Buda (Nanco's salesman) to Nanco. It is evident, therefore, that the merchandise was exported to Manila and returned from there, although the shipper's export declaration may not have been presented to the carrier and was not returned by it to the collector.

The assistant secretary of Nanco, in the affidavit on customs Form 3311, declared that no drawback was paid on any part of the merchandise, and a telegram (plaintiff's collective exhibit 8) from the collector at Honolulu states: "No drawback record Honolulu 1946 shipment watches Nanco or Robert Buda."

The evidence in this record is sufficient to establish the identity of the merchandise and that it was exported without benefit of drawback. In our opinion, in view of the facts and circumstances of this case, such evidence is acceptable in lieu of the certificate of exportation which could not be procured.

We conclude that the imported merchandise, except the waterproof and chronograph watches in package 55, consists of manufactures of the United States, returned, after having been exported, without having been advanced in value or improved in condition while abroad; that said merchandise has been identified with previously exported merchandise; that no drawback has been claimed or paid; and that the regulations have been complied with as far as possible, and, where compliance was impossible, other satisfactory evidence has been produced. Therefore, the merchandise is entitled to free entry under paragraph 1615 (a), *supra*, as American goods returned. To that extent, the protest is sustained. As to all other merchandise and in all other respects, the protest, having been abandoned, is dismissed. Judgment will be rendered accordingly.